**ESSEX COUNTY PRESERVATION ASSOCIATION on Behalf of itself and its members et al., Plaintiffs-Appellants,**

v.

**Bruce CAMPBELL, as Commissioner, Massachusetts Department of Public Works, et al., Defendants-Appellees.**

No. 75–1392.

United States Court of Appeals, First Circuit.

Argued March 3, 1976.

Decided June 18, 1976.

Haynes N. Johnson, Stamford, Conn., with whom Alphonse R. Noe, Stamford, Conn., and Thomas B. Arnold, Boston, Mass., were on brief, for plaintiffs-appellants.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with whom Peter R. Taft, Asst. Atty. Gen., Washington, D. C., James N. Gabriel, U. S. Atty., William A. Brown, Asst. U. S. Atty., Boston, Mass., and Raymond N. Zagone, Atty., Dept. of Justice, Washington, D. C., were on brief, for Federal defendants-appellees.

John J. Twomey, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for State defendants-appellees.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

This appeal concerns the reconstruction and widening (from four to eight lanes) of a portion of Interstate Route 95 (I–95) within Massachusetts, north of Boston. Appellants, various groups of residents in certain of the counties and towns affected, sought to enjoin further work on the project. The district court denied the preliminary injunction, concluding that there was not a probability of success on the merits and that no irreparable harm would result from continued construction. *Essex County Preservation Ass'n v. Campbell,* 399 F.Supp. 208, 220 (D.Mass.1975).

The essential facts are clearly set forth in the opinion of the district court. A final Environmental Impact Statement (EIS) for the project was published in September, 1973 and approved by the United States Department of Transportation in January, 1974.[1] The total project consists of 17 miles of highway and is subdivided into four separate contracts covering approximately equal lengths. The scheduled dates for completion of the four segments range from November 6, 1976, to July 30, 1977. As of the date of the district court's decision (June 25, 1975), the extent of completed construction ranged from 10 to 36 percent. *Id.* at 211.

Appellants urged three main issues to the district court and raise the same claims on appeal. First, they claim that the EIS for the expressway construction failed to meet the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* because it it was prepared by "a financially interested party." Specifically, appellants point to the fact that preparation of the EIS was delegated to the private consulting firm of Fay, Spofford and Thorndike which was also employed by the Commonwealth as the design engineer for two of the four segments of the highway project in question. Appellants contend that NEPA prohibits the responsible federal agency from delegating the preparation of an EIS, particularly when the preparer has a stake in the project's success. The district court agreed,

---

1. Plaintiffs-appellants did not institute suit until July 17, 1974, at which time they requested a temporary restraining order which was denied the same day. *See Essex County Preservation Ass'n v. Campbell, supra* at 211.

ruling that Fay, Spofford and Thorndike's preparation of the EIS was improper under the circumstances.

█ This issue actually involves two separate questions: whether under NEPA the federal agency, in this instance the Federal Highway Administration (FHWA), had an exclusive nondelegable duty to prepare the EIS, and if not, whether part of the task of formulating the EIS could be carried out by a consulting firm otherwise involved in designing the highway project. With regard to the first issue, the district court properly noted that a number of circuits have held that the responsibility for preparing an EIS may be delegated to state agencies provided that there is "significant federal participation." *See, e. g., Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1024–25 (4th Cir. 1975); *Sierra Club v. Lynn,* 502 F.2d 43, 59 (5th Cir. 1974), *cert. denied,* 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 853–55 (8th Cir. 1973); *Life of the Land v. Brinegar,* 485 F.2d 460, 467 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Citizens Environmental Council v. Volpe,* 484 F.2d 870, 873 (10th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). Nevertheless the court placed considerable weight on *Conservation Society of Southern Vermont, Inc. v. Sec'y of Transportation,* 508 F.2d 927 (2d Cir. 1974) which held that the FHWA cannot delegate EIS preparation. During the pendency of the present appeal, however, this decision was vacated by the Supreme Court for reconsideration in light of Pub.L. No. 94–83 which added a new section 102(2)(D) to NEPA.[2] On remand the second circuit reversed its previous decision and held that "[u]nder the law as amended the state agency may prepare the EIS provided the federal agency 'furnishes guidance and participates in such preparation' and provided 'the responsible Federal official independently evaluates such statement prior to its approval and adoption.'" *Conservation Society of Southern Vermont, Inc. v. Sec'y of Transportation,* 531 F.2d 637, 639 (2d Cir. 1976).[3] We agree that under such circumstances the federal agency's obligation to prepare the EIS may be delegated to the state.

█ With regard to the reliance on the efforts of Fay, Spofford and Thorndike, we do not think the EIS was necessarily fatally undermined by their direct participation. *See Sierra Club v. Lynn, supra* at 59. As the district court noted, private consulting firms that are involved in a construction project have been permitted to participate in drafting the EIS on the same project. *Life of the Land v. Brinegar, supra* at 467–68; *see Sierra Club v. Lynn, supra* at 59–60. *But see Greene County Planning Bd. v. Federal Power Comm'n,* 455 F.2d 412 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731, 741 (D.Conn.1972), *aff'd sub nom., Citizens for Balanced Environment and Transportation v. Volpe,* 503 F.2d 601 (2d Cir. 1974), *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100, 44 U.S.L.W. 3205 (1975).

**2.** Section 102(2)(D) provides in pertinent part:

"Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

". . . .

"(ii) the responsible Federal official furnishes guidance and participates in such preparation,

"(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption. . . .

". . . .

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this Act; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction."

**3.** We add that the legislative background of the amendment as sketched by Judge Adams in his opinion, dissenting in part, in *Conservation Society of Southern Vermont, Inc. v. Sec'y of Transportation,* 531 F.2d 637 *supra,* leads us to believe that the federal involvement remains a serious and significant obligation.

We must stress that when project consultants are also used in preparation of the EIS considerable caution should be exercised by the federal agency. The agency clearly may not substitute a private firm's efforts and analysis for its own, and it must bear responsibility for the ultimate work product designed to satisfy the requirement of 42 U.S.C. § 4332(2)(C). Under the circumstances of the instant case, however, we find no departure from these requirements. As noted by the district court, Frederick H. Downs, who was Chairman of the Environmental Committee within the FHWA's Boston division, and who approved the award of the EIS contract to Fay, Spofford and Thorndike, testified that "there was a tremendous amount of input by FHWA." The consulting firm's preliminary draft of the EIS was reviewed by the FHWA Environmental Committee. The agency held a number of meetings with the firm and with the Massachusetts Department of Public Works to discuss the contents of the draft and the policy decisions it raised. The FHWA's Regional Office also reviewed the draft, and after the EIS was completed the Environmental Committee obtained comments from the various agencies involved, see Aberdeen & Rockfish Ry. Co. v. SCRAP, 422 U.S. 289, 321, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975), and these comments were also reviewed. Essex County Preservation Ass'n v. Campbell, supra at 213–14. While the district court noted that the FHWA relied solely on the consulting firm "to gather and collate the basic environmental data," the court specifically found "that there was considerable federal review, discussion, and revision of the EIS as it was

being developed by Fay, Spofford and Thorndike." Id. at 214. In light of these circumstances we are forced to disagree with the conclusion of the district court that the EIS did not meet the procedural requirements of NEPA. The significant and active participation by the FHWA indicates that it did not abdicate its responsibility and precludes us from holding there was any improper or illegal delegation in this case. See Life of the Land v. Brinegar, supra at 468.[4]

■ The second issue raised by appellants concerns the effect of a moratorium declared by Governor Francis Sargent on any extension of I–95 south of Route 128. The moratorium was announced in November, 1972, too late for inclusion in the draft version of the EIS which was circulated for comment to other agencies. Appellants contend that this moratorium was relevant to the reconstruction and widening of I–95 north of Route 128 at issue here, and that a supplemental EIS was required. Specifically, they note that the construction moratorium south of Route 128 into Boston would affect the extent of traffic flow to the northern portion of I–95 and would therefore call into question the original estimates relied on to justify the highway's expansion from four to eight lanes. Appellants also stress that this issue was never exposed to the type of analysis and public comment envisaged by NEPA.

The district court noted that applicable federal highway regulations called for a supplemental EIS when there was a "new or changed environmental effect of significance to the quality of the environment."[5] Essex County Preservation Ass'n v. Camp-

---

4. We note that 23 C.F.R. § 771.7 (1975) which provides that "[c]onsultants may be utilized in preparing all types of environmental studies and reports," also cautions that:

"Work by consultants on environmental studies and reports leading to a project decision should be carefully reviewed to insure that complete and objective consideration is given to all relevant project impacts and alternatives. This is particularly important when the same consultants may be involved in subsequent phases of the highway section development." Id., at § 771.7(b).

Under the circumstances of the present case, we conclude the FHWA's actions met this standard.

5. The specific regulation was PPM90–1 (FHWA Guidelines for Implementing Section 102(2)(C) of the National Environmental Policy Act of 1969 [and other acts], August 24, 1971). See Steubing v. Brinegar, 511 F.2d 489, 493 n. 6 (2d Cir. 1975); I–291 Why? Association v. Burns, 372 F.Supp. 223, 256 n. 103 (D.Conn.1974), aff'd, 517 F.2d 1077 (2d Cir. 1975).

*bell, supra* at 215. While declining to decide whether the Sargent moratorium actually would have such an environmental impact, the court held that a supplemental EIS had to be prepared in order to effectuate the basic aims of NEPA which favor disclosure of all relevant factors affecting agency decisions. *See Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 697 (2d Cir. 1972). We are inclined to agree with this judgment. While we cannot determine with certainty what the ultimate environmental effects of the moratorium will be, it would seem to constitute the type of "significant new information . . concerning [an] action's environmental aspects" that makes a supplemental EIS necessary. 23 C.F.R. § 771.15. Such a supplemental statement, which receives the same type of public comment and exposure as an original EIS, is likely to facilitate the "complete awareness on the part of the actor of the environmental consequences of his action . . .," *National Helium Corp. v. Morton*, 455 F.2d 650, 656 (10th Cir. 1971), mandated by NEPA. It is this type of outside review that can mitigate against errors or possible bias. *See I–291 Why? Association v. Burns*, 372 F.Supp. 223, 245–46 (D.Conn.1974), *aff'd*, 517 F.2d 1077 (2d Cir. 1975). In view of the fact that the reconstruction project at issue here is not yet completed and that certain agency decisions may "remain open to revision," *see Jones v. Lynn*, 477 F.2d 885, 890 (1st Cir. 1973), we cannot say it was improper for the district court to require appellees to prepare and circulate a supplemental EIS directed to the impact of the Sargent moratorium.

■ The third issue raised by appellants is the alleged failure of FHWA officials to comply with their own regulations requiring prior approval of a state environmental "Action Plan" before funding any highway construction project in the Commonwealth. Title 23 C.F.R. § 795, implementing provi-

sions of 23 U.S.C. § 109(h) (Supp.1975), requires each state to develop and submit to the FHWA an "Action Plan." Regulations further provide that the "FHWA will not give location approval[6] on projects after November 1, 1973, unless the Action Plan has been approved." *See Essex County Preservation Ass'n v. Campbell, supra* at 217.

In the instant case the Commonwealth's Action Plan was submitted to the FHWA on April 29, 1974, and approved on July 12 of that year. Although design approval for the various segments of the proposed reconstruction project had been given by the FHWA between September, 1968 and July, 1969, approval of the plans, specifications and estimates (PS & E) was not granted until May 20, 1974. Actual construction began in June of that year. Appellants contend that since the Action Plan was not approved until July 12, 1974, the FHWA approval of the PS & E in May was improper. In reply the appellees point to the prior design approvals and to the fact that regulations provide that Action Plans are not to be applied retroactively to parts of projects already approved. *See id.* at 217. The district court ruled that "[w]hile development and design of the instant project may have been completed in 1969," the FHWA was required to have approved the State Action Plan prior to approving the PS & E and consequently the latter approval was "illegal and improper." *Id.* at 217–18. In view of the fact that FHWA approval of Action Plan guidelines has been required of projects which had received necessary approvals for earlier stages, but which had not yet received PS & E approval, *see Movement Against Destruction v. Volpe*, 361 F.Supp. 1360, 1401 (D.Md.1973), *aff'd*, 500 F.2d 29 (4th Cir. 1974), and that the FHWA's approval of PS & E was the step which actually bound the federal government to pay for the costs of the highway project in question, *see Lathan v. Brinegar*,

**6.** The "location" stage of planning refers to the period from the end of the analysis of transportation needs "through the selection of a particular location" for the proposed highway project. 23 C.F.R. § 795.2(e)(2) (1975). In view of the fact that the project at issue in this case involves the widening and reconstruction of an existing highway with a fixed location, the regulation in question would appear to be of limited applicability.

506 F.2d 677, 686 (9th Cir. 1974), we uphold the judgment of the district court.

Since this case is before us on appeal from the denial of a preliminary injunction, a matter committed to the discretion of the district court, see *Anheuser-Busch, Inc. v. Teamsters Local No. 633, Nat'l Conference of Brewery and Soft Drink Workers*, 511 F.2d 1097, 1099 (1st Cir.), *cert. denied*, 423 U.S. 875, 96 S.Ct. 148, 46 L.Ed.2d 109, 44 U.S.L.W. 3226 (1975); *Pauls v. Sec'y of Air Force*, 457 F.2d 294, 298 (1st Cir. 1972), the scope of our review is somewhat constricted. An appellate court ordinarily "will not disturb the orders of the District Court except for abuse of discretion or clear error, . . . and we do not consider the merits of the case further than necessary to determine whether that discretion was abused . . ." *Jones v. District of Columbia Redevelopment Land Agency*, 162 U.S.App.D.C. 366, 499 F.2d 502, 507 (1974), *cert. denied*, 423 U.S. 937, 96 S.Ct. 299, 46 L.Ed.2d 271, 44 U.S.L.W. 3264 (1975). Although we reject the district court's finding that the EIS in question failed to comply with the NEPA procedures due to the involvement of an interested private consulting firm, see discussion *supra*, we uphold its other judgments. Consequently, we must decide whether the court's denial of injunctive relief was improper under these circumstances.

While the court required the filing of a supplemental EIS on the impact of the Sargent moratorium to effectuate the disclosure aims of NEPA, it found that no irreparable harm would result if construction was not halted. Similarly, with regard to the timeliness of the approval of the Commonwealth's Action Plan, the court concluded that although a "technical noncompliance" [7] with 23 U.S.C. § 109(h) had been established, appellants failed to demonstrate that this violation resulted in or would cause any environmental harm. *Essex County Preservation Ass'n v. Campbell*, *supra* at 218. Despite these findings which we cannot say are clearly erroneous,[8] appellants contend that the fact that there has been a violation of statutory requirements *per se* necessitates the issuance of a preliminary injunction "irrespective of whether or not there is a showing of irreparable harm." We do not agree, however, that this assertion is a fully accurate statement of existing law.

While courts have held that in certain "exceptional cases" it is not necessary to balance the equities in issuing an injunction based on noncompliance with NEPA requirements, see, e. g., *Lathan v. Volpe*, 455 F.2d 1111, 1116 (9th Cir. 1971), the courts have also indicated that such cases are "comparatively rare," see *Keith v. Volpe*, 352 F.Supp. 1324, 1349 (C.D.Cal.1972), *aff'd*, 506 F.2d 696 (9th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Lathan v. Volpe, supra* at 1117. In most of these cases there have been either serious and *substantive* deficiencies in the EIS or equivalent study, see, e. g., *Atchison, Topeka and Santa Fe Ry. Co. v. Callaway*, 382 F.Supp. 610, 620–22 (D.D.C.1974) (EIS held deficient in covering only first phase of what was likely to be an extensive multiphase project); *Keith v. Volpe, supra* at 1350 (housing study found inadequate for failing to determine the availability of replacement housing for relocation purposes); *Sierra Club v. Coleman*, 405 F.Supp. 53

---

7. As noted earlier, the Action Plan was approved by the FHWA one and a half months after PS & E approval was given. *Essex County Preservation Ass'n v. Campbell, supra* at 218.

8. For example, although the moratorium on construction of I–95 south of Route 128 might have the effect of decreasing traffic on the northern portion of I–95, such a result is far from certain. As the court properly noted, I–95 is "the major north-south route on the Atlantic coast and provides a direct route from the urban centers of the Atlantic seaboard to New Hampshire, Maine, and the Maritime Provinces of Canada." Moreover, the southern terminus of the proposed reconstruction will join an eight lane highway that connects to Route 128, and the northern terminus will connect to the New Hampshire section of I–95 which is currently being widened to eight lanes. *Essex County Preservation Ass'n v. Campbell, supra* at 210.

(D.D.C.1975), 8 ERC 1477, 1478 (EIS contained "substantive defects"; failed to consider possible transmission of "foot-and-mouth" disease), or else no EIS at all, *see, e. g., Lathan v. Volpe, supra; Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 161 (1972).

We agree that in such situations there is less need to balance other factors before deciding whether to issue a preliminary injunction. These situations appear distinguishable from the instant case, however, where the district court (we think fairly) characterized the violation of the Highway Act as a "technical noncompliance" and where the court found that the EIS was "comprehensive," "well documented," and covered "all the environmental consequences raised by the widening of the highway."[9] *Essex County Preservation Ass'n v. Campbell, supra* at 214. In such situations it is not improper for a court to weigh competing considerations in deciding the appropriateness of injunctive relief. *See Sierra Club v. Callaway,* 499 F.2d 982, 988, 992 (5th Cir. 1974); *Environmental Defense Fund, Inc. v. Froehlke,* 473 F.2d 346, 356 (8th Cir. 1972).[10] Under the circumstances of the present case we cannot say the district court abused its discretion in denying the request for a preliminary injunction.

*Affirmed.*

---

**9.** Appellants also contend that the EIS was defective because it failed to take into consideration the so-called "energy crisis" and its possible impact on automobile traffic in Massachusetts. Appellants also argue that they had extensive proof on this issue which the district court excluded. The court found the asserted impact of the energy crisis to be "highly speculative" and excludable from the EIS. *Essex County Preservation Ass'n v. Campbell, supra* at 210–11. While we note the difficulty of this question, in the instant case we cannot say the court's finding was clearly erroneous. We do not imply, however, that the question of an energy crisis and its possible environmental impact might not be a relevant consideration for an EIS in a different factual situation.

**10.** As we have noted, in certain situations "the task of accommodating the requirements of NEPA to . . . [a] project . . . requires imagination and flexibility on the part of [the] . . . agencies involved, and on the part of the court." *Jones v. Lynn, supra* at 892.